**EXHIBIT A**

**DECLARATION OF BRENDAN GRACE IN SUPPORT OF VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

I, Brendan Grace, Special Agent with the Drug Enforcement Administration ("DEA") do hereby declare:

**Introduction and Agent Background**

1. I am employed as a Special Agent with the DEA and have been so employed since May 2020. I am currently assigned to the High Intensity Drug Trafficking Area ("HIDTA") Group 51 of DEA's Baltimore District Office.

2. As part of my employment with DEA, I attended the Basic Agent Training Program, a residential program that included academic instruction in the basics of report writing, law, firearms, surveillance techniques, interview and interrogation techniques, automated information systems, drug identification, defensive tactics, as well as leadership and ethics. I have also participated in the execution of search and seizure warrants yielding drugs, currency, and firearms.

3. Through my training, education, experience, and the experience of those with whom I work, I have become familiar with street sales of illicit drugs; the use of "stashes" and "stash houses"; the prices, quantities, and packaging of illicit drugs; the use of couriers in the distribution of illicit drugs; the methods and modes of communication, and counter-surveillance techniques employed by drug traffickers; language, terminology, traits, actions, and codes used by drug traffickers; the manufacturing and processing of controlled dangerous substances; and methods of asset concealment utilized by dealers of illicit drugs.

4. Through my training and experience, I am also aware that drug traffickers commonly utilize vehicles to pick up and deliver controlled dangerous substances ("CDS"); meet

with CDS customers, sources, and co-conspirators; and transport CDS and proceeds to stash locations and transport money to suppliers or third parties to pay for the CDS.

## Purpose of This Declaration

5. This Declaration is submitted in support of the Verified Complaint for Forfeiture *In Rem* of approximately $173,338.00 in U.S. Currency (Asset ID Nos. 24-DEA-712140, 24-DEA-712142, 24-DEA-712144, and 24-DEA-712145) and two Rolex watches (Asset ID Nos. 24-DEA-7131508 and 24-DEA-713511) seized on or about May 8, 2024, from 10101 Twin Rivers Road, Apartment 301, Columbia, Maryland (collectively, the "Defendant Property").

6. I submit that there are sufficient facts to support a reasonable belief that the Defendant Property constitutes: (1) moneys or other property furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; or (3) moneys used or intended to be used to facilitate a violation of the Controlled Substances Act in violation of 21 U.S.C. § 841, and thus is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## Summary of the Investigation

### General Background

7. Since in or around May 2022, members of the DEA have been conducting an investigation into the illicit narcotics distribution and money laundering activity of Tavon Robinson ("Robinson") and his work for a Mexican drug trafficking organization ("DTO").

8. Based on my training, knowledge, and experience, I know that DTOs use various methods to transport and launder drug trafficking proceeds. DTOs often use couriers to collect proceeds and, in some instances, the couriers deliver the proceeds to individuals who transport the

proceeds to their ultimate destination—often across the U.S. border into Mexico as well as other countries.

9. I know based on training, knowledge, and experience that in the hierarchy of DTOs, there are frequently individuals assigned to collect proceeds after a large supply of narcotics has been sold on the street by local traffickers. These individuals transfer the proceeds to others, who in turn launder the proceeds for the DTO. Based on the current investigation into Robinson, I believe Robinson collects proceeds that are intended to be transported to launderers for the DTO.

10. To facilitate these transfers, DTO money launderers use security measures to establish that the drug trafficking proceeds are only being handled by individuals trusted by the DTO. An individual known as a "money broker" will coordinate a money "pick-up" for the DTO by arranging for a trusted intermediary to retrieve drug trafficking proceeds from local "collectors" such as Robinson and deliver those proceeds to the money launderers. To preserve anonymity and protect the DTO, these individuals are often unknown to one another. Due to this anonymity, when an intermediary is contacted by the money broker to do a pick-up, the intermediary must provide the money broker with a serial number from a dollar bill, a telephone number, and a name (generally a nickname) for the individual who will pick up the proceeds. The serial number on the dollar bill acts as a "one-time use code" between the collector and the intermediary. The money broker will then relay this information to the DTO, who will tell the collector. During the money pick-up, the intermediary receiving the proceeds produces the dollar bill to the collector so that both parties know that they are meeting the correct individual. Once the serial number is confirmed, the money is exchanged.

11. As part of the ongoing investigation into Robinson, Undercover Officers ("UCs"), posing as members of the DTO, as well as informants from the DTO, have picked up over $300,000

worth of suspected drug proceeds directly from Robinson, and transferred those proceeds to the DTO's money launderers.

January 31, 2024 – Money Pick-Up from Robinson

12. On January 29, 2024, investigators learned from a partnering office about a potential upcoming money pick-up from a collector in Baltimore, MD. The next day, an unknown male using an international phone number ("UM1")—who investigators believe is a money broker—contacted one of the UCs working within the DTO ("UC1"). During their conversation, the unknown male and UC1 agreed that serial number F86542505L, from a dollar bill, would be used to confirm the transaction between UC1 and an unidentified local money collector. UM1 advised UC1 that the money contract was for "100," which I understand—based on my training and experience—referred to $100,000 in drug trafficking proceeds. Through his work for the DTO, UC1 knew that the $100,000 under discussion was proceeds of drug trafficking, not legitimate funds. UC1 and UM1 determined the meeting would be held at 825 Dulaney Valley Road, Towson, MD 21204. Based on evidence collected during the investigation, investigators knew that this address was in an area where Robinson typically operated and suspected that Robinson would be the local collector delivering the drug trafficking proceeds to UC1. UM1 asked UC1 to call when UC1 arrived at the location.

13. On January 31, 2024, at approximately 7:00 p.m., UC1 arrived at the agreed-upon location, and investigators set up covert surveillance. UC1 then called UM1, who contacted the local collector coming to meet UC1, addressing that individual as "T." During the call, UC1 could hear UM1's conversation with "T," who advised UM1 that he was driving a black Chevrolet Malibu. At approximately 7:16 p.m., law enforcement observed a Chevrolet Malibu bearing Virginia registration TSB8809 (the "Malibu") arrive and stop in front of UC1's vehicle before

driving away. UC1 followed the Malibu into a parking garage. After stopping, UC1 exited their vehicle and approached the driver's side of the Malibu, at which time UC1 was able to identify the driver and sole occupant of the Malibu as Robinson. Robinson told UC1 to follow him, and they both drove to a different parking garage. UC1 exited their vehicle and entered Robinson's vehicle, then handed Robinson the dollar bill with serial number F86542505L. Robinson was on the phone with UM1 at the time and took a photo of the dollar bill. Robinson then advised UM1 that he was sending the picture of the dollar bill to UM1. Robinson then reached behind him and retrieved a white Balenciaga bag, which he handed to UC1. Investigators later determined the contents of the bag to be approximately $99,940 in U.S. currency.

14. During the exchange, UC1 noticed a black Jeep that was parked across from UC1's vehicle. UC1 observed a black male with a bush haircut and gray hoodie ("UM2") exit the Jeep. After receiving the Balenciaga bag, UC1 observed Robinson retrieve another phone from between his legs and make a phone call. At the same time, UC1 observed UM2 answer his phone and walk in front of Robinson's vehicle, staring inside the vehicle as he passed. After UM2 walked to the next level of the parking garage, Robinson ended the phone call and said goodbye to UC1. UC1 took the Balenciaga bag and departed.

15. Based on my training, knowledge, and experience, I believe that the above-described exchange was an arranged pick-up of drug trafficking proceeds, in which Robinson filled the role of collector. UC1 ultimately passed the $99,940 in U.S. currency to the DTO's money launderers.

March 8, 2024 – Money Pick-Up from Robinson

16. Between March 6, 2024, and March 8, 2024, a second undercover operative ("UC2") had several conversations with an unknown individual (UI) regarding a money pick-up

of approximately $50,000 in U.S. currency. Based on information from an informant within the DTO, this money represented drug trafficking proceeds and was expected to be deposited in a bank account and would be transferred through at least one further account after UC2 transferred it to the DTO's money launderers. During communications with UI, UC2 provided a picture of a dollar bill with serial number G68754654D.

17. On March 8, 2024, UC2 went to the planned pick-up spot, 10300 Little Patuxent Parkway, Columbia MD 21044, in the vicinity of a Bank of America at the location. The UI advised that the unidentified target dropping off the money—later identified as Robinson—was driving a black Dodge Durango with Minnesota license plate KRT525 (the "Durango"). Similar to the above-described exchange with UC1, Robinson arrived at the pick-up spot at approximately 11:55 a.m. and had UC2 follow him to a parking garage beside the Bank of America. At the parking garage, Robinson rolled down the window of the Durango and asked UC2 for the "ticket." UC2 handed Robinson the dollar bill with serial number G68754654D. Once he had confirmed the serial number, Robinson handed UC2 an orange Louis Vuitton bag containing approximately $53,865.00 in U.S. currency in heat-sealed packaging.

18. Based on my training, knowledge, and experience, I believe that the above-described exchange was an arranged pick-up of drug trafficking proceeds, in which Robinson filled the role of collector. UC2 ultimately passed the $53,865.00 in U.S. currency to the DTO's money launderers.

Use of Rental Vehicles

19. DEA's investigation has shown that Robinson is in a relationship with a woman named Sykima Mobley (hereinafter "Mobley"). Robinson has used her name and information (with or without her knowledge) to conceal his residences and use of various vehicles, consistent

with an effort to avoid identification by law enforcement. For example, both cars Robinson used during the above-described money pick-ups were registered to Avis Rental Car, and records obtained pursuant to an administrative subpoena show that both cars were rented in Mobley's name. Records obtained pursuant to that subpoena further showed a pattern of approximately month-long rentals by Mobley during 2024, including additional vehicles investigators have observed being operated by Robinson.

20. Based on my training, knowledge, and experience, I know drug dealers often use rental vehicles for short periods of time in order to make it more difficult for law enforcement to track and follow them. I also know that drug traffickers commonly use family or friends, such as Mobley, to rent vehicles and residences on behalf of the drug trafficker. This is done to evade detection by law enforcement and distance the drug trafficker from any connection to vehicles or residences used in furtherance of their illegal activities.

Suspicious Banking Transactions

21. On April 17, 2024, investigators observed Robinson and Mobley arrive at the Bank of America located at 6201 Dobbin Road, Columbia, Maryland together. Mobley entered first, holding multiple stacks of U.S. currency. Once Mobley returned from the bank, Robinson then entered, also holding multiple stacks of U.S. currency. Robinson came back to his vehicle once more to retrieve additional currency, which he deposited money in the bank's ATM. Based on my my training, knowledge and experience, I know drug traffickers and money launderers often attempt to avoid triggering financial reporting requirements for large cash transactions through "structuring." Traditionally, structuring involves splitting large amounts of illicit proceeds into smaller amounts, then having multiple people deposit those smaller amounts separately at a bank.

Based on the observed activity, I believe Robinson and Mobley were engaged in structuring transactions at the Bank of America on April 17, 2024.

Seizure of the Defendant Property

22. On May 8, 2024, the Honorable Pamila J. Brown of the District Court of Howard County signed search and seizure warrants for—among other locations—Robinson's person and primary residence, located at 10101 Twin Rivers Road, Apartment 301, Columbia, Maryland (the "Twin Rivers Premises").

23. Investigators executed the search warrant at the Twin Rivers Premises on May 8, 2024. During the search, they found and seized the Defendant Property. Specifically, investigators found the following:

    a. a black Under Armour handle-bag that contained approximately $85,550 in U.S. currency, located in the main bedroom closet;

    b. a black backpack containing approximately $44,512, located in the main bedroom closet;

    c. a Nike shoebox and gray jacket collectively containing approximately $11,206 in U.S. currency, located in the main bedroom closet and kitchen, respectively;

    d. a Rolex watch in a watch box, located on a shelf in the main bedroom closet;

    e. a black drawstring bag containing approximately $32,070 in U.S. currency, located in the main bedroom; and

    f. a Rolex watch located on Robinson's person.

24. All U.S. currency was separated into stacks held together with rubber bands which, based on my training and experience, is consistent with the manner in which drug traffickers store their proceeds.

<u>Criminal and Wage histories</u>

25.     Robinson has a criminal history dating back to 1999, with convictions for both unlawful possession of controlled substances as well as for firearm and narcotics trafficking. Mobley does not have a criminal drug history.  Robinson does not have a wage history in Maryland, while over the past seven years, Mobley's annual reported wages to the state of Maryland have never surpassed $66,000.  The value of the Defendant Property is inconsistent with the reported wage histories for both Robinson and Mobley.

## Conclusion

26.     Based on the foregoing facts and my training and experience, I maintain there is probable cause to believe that the Defendant Property seized from 10101 Twin Rivers Road, Apartment 301, Columbia, Maryland on or about May 8, 2024 constitutes: (1) moneys furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; or (3) moneys used or intended to be used to facilitate a violation of the Controlled Substances Act in violation of 21 U.S.C. §§ 841, and thus is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this __23rd__ day of October, 2024.

_____
Brendan Grace
Special Agent
Drug Enforcement Administration